UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\*\*\*

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br>vs.<br><br>DARRYL HENDERSON,<br><br>　　　　Defendant. | 2:20-cr-00363-APG-VCF-1<br><br>**REPORT AND RECOMMENDATION**<br><br>**AND**<br><br>**ORDER**<br><br>MOTION TO SUPPRESS [ECF NO. 30];<br>MOTION TO COMPEL [ECF NO. 40];<br>MOTION TO STRIKE A PORTION OF DEFENDANT'S SUPPLEMENTAL REPLY [ECF NO. 50] |

　　　Defendant Darryl Henderson filed a motion to suppress and motion to compel. ECF Nos. 30 and 40. On June 25, 2021, I held an evidentiary hearing on the motion to suppress. ECF No.42. The parties filed written supplemental briefing to the motion to suppress. ECF Nos. 46, 48, and 49. The government then filed a motion to strike a portion of the defendant's reply to the supplemental brief. ECF Nos. 50. I recommend that the motion to suppress be denied. ECF No. 30. I deny the motions to compel and to strike. ECF Nos. 40 and 50.

　　**I.　　Background**

　　　The government charged defendant Darryl Henderson with unlawfully possessing a firearm in violation of 18 U.S.C. Sections 922(g)(1) and 924(a)(2). The government alleges that LVMPD Officer

Pfotenhauer, while using an undercover Facebook account, saw a video on Henderson's account and, "captured a screenshot from the news feed of a black male with a two-toned watch on his right wrist, holding what Officer Pfotenhauer recognized and believed to be a Keltec pistol." *Id.* at 4. The complaint also states that Officer Pfotenhauer then, "observed two additional videos of a black male holding, manipulating, and firing the same firearm. The male appeared to be in the desert wearing the same two-toned watch on his right wrist." *Id*. The complaint also states that, "[i]n the videos, a person off camera calls out 'Darryl' and the person holding the firearm responds." *Id*. The government also alleges that, "Officer Pfotenhauer recognized the responding voice of the person holding the firearm to be [Henderson]'s voice." *Id*. The LVMPD then began surveillance on Henderson, they observed Henderson leave the King Richard residence and get into a car as a passenger when, "a vehicle stop was initiated where [Henderson] was taken into custody." *Id.* at 5. The police arrested Henderson without an arrest warrant, and once in custody Henderson admitted that he had shot a gun that did not belong to him. *Id*. The police then obtained a search warrant and seized two guns from his home. *Id.*

### A. Motion to suppress

The defendant argues in his motion to suppress that the police arrested him without probable cause because the three videos Officer Pfotenhauer viewed on Facebook do not show anyone's face, reveal who is filming, or reveal when the videos were filmed. ECF No. 30 at 1-2. Defendant argues that instead of applying for an arrest warrant, the police waited three weeks (after the videos were no longer available on Facebook[1]) to conduct surveillance on Henderson, and they did not obtain any new information to support an arrest warrant as part of the surveillance. *Id.* at 2. The defendant argues that his warrantless arrest was unlawful, and so everything the police obtained after the unlawful arrest should be suppressed. *Id*.

---

[1] At the evidentiary hearing, Officer Pfotenhauer testified he watched two videos posted to the "Stories" section of the "Darryl Kingnova Henderson" Facebook page. ECF No. 45 at 26, 41-42.

2

The defendant attached Officer Pfotenhaur's report to his motion to suppress. ECF No. 30-2. Officer Pfotenhauer's states in his report that he saw the three videos (the three videos do not show Henderson's face) on Facebook and he included two screenshots in his report: the first one (referred to here as Figure 1) is a screenshot from one of the three gun videos. *Id.* at 2-4. The second screenshot (Figure 2) is from elsewhere on Henderson's Facebook page (i.e. the Figure 2 screenshot is not part of any of the three gun videos) but Officer Pfotenhauer included it in his report to show Henderson's watch. *Id*. Here are the two screenshots in Officer Pfotenhauer's report:

**Figure 1**     **Figure 2**




The government states in its response that Officer Pfotenhauer was a patrol officer participating in proactive investigations into prostitution related crimes. ECF No. 32 at 2. The government states that on August 12, 2020, Officer Pfotenhauer used a covert Facebook account that was Facebook "friends" with Darryl Henderson and Pfotenhauer saw the three gun videos on Facebook. ECF No. 32 at 2. Officer

3

Pfotenhauer could not find any photos or videos depicting Henderson's face while in possession of the firearm, but he observed the selfie style video (above at Figure 2) that showed Henderson wearing the gold-and-silver banded watch and took a screen shot. *Id.* at 4-5.

  The government argues that after the allegedly unlawful arrest, Henderson admitted that he shot a gun, which the police noted in their application for a telephonic search warrant of the apartment, and the police found guns at the apartment. ECF No. 30 at 2. The government notes that Henderson then appeared in state court: the state court judge entered a finding of probable cause and ordered Henderson detained. ECF Nos. 32 at 11 and 32-1 at 2. While detained, Henderson made multiple recorded jail calls during which he admitted to shooting a firearm. ECF No. 30 at 2. The police also discovered additional videos that show Henderson's face while he is shooting the gun via another subsequently obtained search warrant. ECF No. 32 at 11.

  Henderson contends that his arrest was unlawful, and that everything that happened after the arrest must be suppressed. *Id*. The government contends that even if the arrest was unlawful, that his recorded jail calls should not be suppressed because they occurred after the state court judge found probable cause for his arrest which the government views as an intervening circumstance. ECF No. 32 at 19.  The defendant argues in his reply that the government heavily relies on evidence it obtained after his unlawful arrest to justify his warrantless arrest. ECF No. 34 at 1. The defendant also argues Officer Pfotenhauer—the only Metro officer who viewed the three gun videos prior to the arrest—never mentioned seeing these videos posted as "Facebook Live" videos; Henderson argues this is significant because a Facebook Live video documents activities in real time and has a "live" signifier on the video. *Id*. at 8. The screenshots do not have the live signifier. *Id*. Henderson also argues that other people have access to his Facebook account: for example, while Henderson was in custody someone else posted pictures of his son on his Facebook page (Henderson does not reveal who else has access to the Facebook page). *Id*. Henderson also notes in his reply that Officer Pfotenhauer did not mention that

4

there was a second set of hands holding one of the guns (a tattooed hand which is not Henderson, see Figure 3 below) which Henderson contends undercuts his credibility. *Id.* at 11.

**Figure 3**



Henderson also argues that contrary to Officer Pfotenhauer's report, there is no "response" after a woman says Darryl and the video does not identify how many other people are with the group in the area or who is holding the gun. *Id.* at 5. Henderson also argues that in the subsequent search warrant affidavit, Detective Ostrovsky misrepresented that Officer Pfotenhauer viewed Henderson holding and shooting a firearm in the desert in the videos. *Id.* at 16. Henderson argues that the jail calls would be suppressed if the arrest was unlawful because the calls occurred soon after the unlawful arrest. *Id.* at 21.

At the evidentiary hearing on the motion to suppress, Officer Pfotenhauer, Detective Ostrovsky, and Federal Bureau of Investigation Special Agent Mollica testified. ECF Nos. 42, 44 and 45. Officer Pfotenhauer testified that he observed the videos of the person he believed to be Henderson holding and shooting a firearm on the Facebook account named "Darryl Kingnova Henderson." ECF No. 45 at 23-27.  He also testified that the videos were part of Henderson's "story" on Facebook and were not "live."

*Id.* Officer Pfotenhauer also testified that he compared photos from Henderson's mugshots to the photos on Facebook, and he observed that in the videos on Facebook Henderson appeared over the age of 21. *Id.* at 69.

Detective Ostrovsky testified that he learned about the Facebook posts from Officer Pfotenhauer. ECF No. 44 at 6-10. Detective Ostrovsky testified that he saw the screenshots prior to the arrest. *Id.* Detective Ostrovsky also testified that he reviewed the Henderson Facebook page, that he corroborated the information he received from Detective Pfotenhauer, including, but not limited to, comparing the photos of Henderson's mugshots to the photos on Facebook and comparing the birthdates. *Id.* Detective Ostrovsky also testified that when he reviewed the Henderson Facebook account, he did not see any other male, other than Henderson, wearing the gold and silver colored watch. *Id.* at 73. Detective Ostrovsky also testified that law enforcement made many unsuccessful attempts to locate Henderson before they located him. *Id.* at 75. After investigators observed photos of the King Richard Apartments on the Henderson Facebook page, they conducted surveillance: Detective Ostrovsky then located Henderson. *Id.*

Detective Ostrovsky noted in his search warrant declaration that when he looked at the Henderson Facebook page he, "view[ed] a male, later identified as Darryl Henderson, date of birth…SCOPE ID#.... holding and shooting a firearm in an unknown part of the Las Vegas desert area." ECF No. 30-5 at 3. Detective Ostrovsky also noted in the search warrant declaration that Officer Photenhauer identified Henderson discharging the KelTec handgun on Facebook, "based on a watch that Henderson was wearing when he took a photo of himself and uploaded it to his Facebook live feed." *Id*. at 4. Detective Ostrovsky noted the watch in the search warrant declaration more than once. *Id.* Detective Ostrovsky also noted in the search warrant declaration that after LVMPD read Henderson his Miranda warnings, when law enforcement asked him about shooting a gun and posting it on Facebook, Henderson admitted that he shot a gun but said the firearm did not belong to him. *Id.* at 5.  Detective

6

Ostrovsky also noted that when law enforcement asked him if there were any firearms inside of his residence he stated that any firearms inside the residence are not registered to him. *Id.* Detective Ostrovsky also noted in the search warrant declaration that the female driver of the car that Henderson was in told law enforcement, "that she ha[d] overheard Henderson and his brother talking about guns, and they had purchased the gun that was registered." *Id.* at 6. He also stated that when detectives conducted a premises freeze at the residence, "Henderson's brother and mother corroborated that there [we]re firearms inside of the residence." *Id.*

Detective Ostrovsky testified at the evidentiary hearing regarding the accuracy of the information that he included in the search warrant declaration. ECF No. 44 at 26. He testified that he identified Henderson in part based on the watch he was wearing in the pictures and screenshots from the Henderson Facebook account. *Id.* Detective Ostrovsky also testified that he did not know the difference between a live video and a story video on Facebook. *Id.* at 56. Special Agent Mollica testified regarding the search warrant on the Darryl Henderson Facebook account. *Id.* at 62.

**B. Motion to compel**

Defendant argues in his motion to compel that Judge Youchah, in another case (in *United States v. Gerald Longmire*, 2:19-cr-0112-APG-EJY), concluded that Detective Ostrovsky violated defendant Longmire's constitutional rights by conducting an unlawful search of his car. ECF No. 40 at 4. Defendant argues that the government must turn over turn over material related to Detective Ostrovsky, including any repercussions and consequences Ostrovsky faced after Longmire's case, additional trainings required by Las Vegas Metro, and any notes in Ostrovsky's personnel file resulting from Longmire's case. *Id.* The government argues in its response that the unrelated *Longmire* case is not relevant; it argues it will produce Henthorn material as required. ECF No. 41 at 3. The government argues that there is no impeachment issue here because Judge Youchah did not did not make an adverse credibility finding regarding Detective Ostrovsky. *Id.* Defendant argues in his reply that, "[b]ased upon

the testimony presented at the evidentiary hearing, Mr. Henderson does not anticipate needing to recall Detective Seymon Ostrovsky to address any history of failing to comply with Las Vegas Metropolitan Police policy and engaging in unconstitutional behavior for the purposes of securing an arrest." ECF No. 47 at 1.

### C. Motion to strike a portion of defendant's supplemental reply

The government argues in its motion to strike that Henderson presented arguments for the first time in his post-evidentiary hearing supplemental reply for suppression of the evidence returned from the federal Facebook search warrant. ECF No. 50 at 4, citing to ECF No. 49 at 9. The defendant concedes in his motion that, "a finding that the arrest was lawful would render any attack on the federal search warrant moot." ECF No. 51 at 1. The government argues in its reply that Henderson's arguments regarding the federal search warrant are untimely. ECF No. 52 at 1.

## II.   Discussion

### A. Analysis of the motion to suppress

#### i. Whether the police had probable cause to arrest Henderson without a warrant

"[A] warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). The Court must determine "whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense." *Beck v. State of Ohio*, 379 U.S. 89, 91 (1964). "An arrest is not justified by what the subsequent search discloses." *Henry v. United States*, 361 U.S. 98, 103 (1959).  The United States Supreme Court created the exclusionary rule as "a deterrent sanction that bars the prosecution from introducing evidence

obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231–32 (2011); see also *Wong Sun v. United States*, 371 U.S. 471.

Before the police arrested Henderson, Officer Pfotenhauer testified that he (1) watched the three gun videos (the videos were no longer available after he watched them) and (2) he took screenshots of the videos he watched (he included two in his report, Figures 1 and 2 above). Although Henderson argues that officers did not know if Henderson himself posted the videos, I do not find that argument persuasive because Officer Pfotenhauer knew that a Facebook user named "Darryl Kingnova Henderson" posted the videos. Officer Pfotenhauer testified that he watched the videos on Facebook that show a man who is wearing a silver and gold watch handling a firearm and he testified that he also saw an image of a male with his face depicted and wearing the "same watch." ECF No. 45 at 56.

Officer Pfotenhauer compared the selfie picture on the "Darryl Kingnova Henderson" page to Henderson's mug shot. *Id*. at 67. Officer Pfotenhauer also testified that he compared the videos he saw of the male wearing a watch possessing the firearm with other videos on the Facebook page where he could clearly see the whole person while he was speaking. *Id.* at 54. Officer Pfotenhauer also matched the date of birth from police records to the date of birth on the Henderson Facebook page. Although none of the videos recovered from Facebook depict the man shooting a gun responding to the name "Darryl" the absence of this video does not undermine Officer Pfotenhauer's credibility given that he tested his conclusion that it was Henderson in the other videos by comparing multiple factors. The fact that there is a second person, with a tattooed hand, in one of the videos holding a gun as well is irrelevant because the video shows that there is more than one person in the room handling the gun.

Officer Pfotenhauer determined, based on his experience as law enforcement officer, that the voices matched, the pictures that show a face match, the watches in the pictures that show a face and that show a person holding a gun match, and the Facebook user information, such as the birthdate,

matched police records. While Officer Pfotenhauer may not have known with unquestionable certainty that the videos depicted Henderson committing a crime, unquestionable certainty is not the standard. "The rule of probable cause is a practical, nontechnical conception affording the best compromise that has been found for accommodating…often opposing interests. Requiring more would unduly hamper law enforcement. To allow less would be to leave law-abiding citizens at the mercy of the officers' whim or caprice." *Brinegar v. United States*, 338 U.S. 160, 176, 69 S. Ct. 1302, 1311 (1949).

I find that the arresting officers' conduct falls within the proper balance here between these opposing principles in a probable cause analysis based on these facts. The gold-and-silver banded watch is distinct. It was reasonable for Officer Pfotenhauer to believe that Henderson is holding the guns in the videos since he is wearing that same watch in the other picture that shows his face. Pfotenhauer had probable cause to believe that Henderson is the person holding at least one of the guns in the videos because of the distinct gold-and-silver banded watch. I find that it was reasonable for Officer Pfotenhauer to conclude, based upon his investigation, that Henderson himself shot guns in the videos in the Facebook posts and posted them to his own Facebook page. I find that the officers had probable cause to arrest Henderson.

### ii. Whether the search warrant is valid

The Fourth Amendment confers the right for people to "be secure in their persons, houses, papers and effects, against unreasonable searches and seizures…" U.S. Const. amend. IV. To protect this right, under normal circumstances, law enforcement must procure a search warrant before they are able to legally invade the privacy of another. *Steele v. United States*, 267 U.S. 498 (1925). For a search warrant to be valid, it must be supported by an affidavit establishing probable cause. *United States v. Mayer*, 560 F.3d 948, 958 (9th Cir. 2009).

"A police officer has probable cause to conduct a search when the facts available to [him] would warrant a person of reasonable caution in the belief that contraband or evidence of a crime is present." *Fla. v. Harris*, 568 U.S. 237, 243 (2013) (citations, internal quotation marks, and brackets omitted). This is a "practical and common-sensical standard" that requires consideration of "the totality of the circumstances." *Harris*, 568 U.S. at 243 (citations omitted). This standard "is not reducible to 'precise definition or quantification,'" and the Supreme Court has expressly "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Id.* at 243–44 (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)).

There need only be "a fair probability that contraband or evidence of a crime will be found in a particular place" to support a finding of probable cause. *Illinois v. Gates*, 462 U.S. 213, 214 (1983). "And the duty of a reviewing court is simply to ensure that the magistrate had a 'substantial basis for…conclud[ing]' that probable cause existed." *Id.* at 238–39 (quoting *Jones v. United States*, 362 U.S. 257, 271 (1960)). "[T]his 'substantial basis' standard of review embodie[s] the great deference that should be shown by reviewing courts to magistrates' probable cause determinations." *United States v. Seybold*, 726 F.2d 502, 503 (9th Cir. 1984) (citation omitted).

This court does not, however, exhibit the same deference to the probable cause determination if there is a legal deficiency or error that requires the court to "correct" the warrant affidavit. *United States v. Nora*, 765 F.3d 1049, 1058 (9th Cir. 2014). ("Thus, after excising the [illegally obtained evidence], [the court] must determine whether the remaining untainted evidence was sufficient to support issuance of the warrant. [The court] make[s] that determination without the usual deference owed to the magistrate's initial finding of probable cause.") (citation omitted).

"The validity of a search warrant depends upon the sufficiency of what is found within the four corners of the underlying affidavit. An affidavit is sufficient if it establishes probable cause; that is, if

the stated facts would reasonably allow a magistrate to believe that the evidence will be found in the stated location." *United States v. Taylor*, 716 F.2d 701, 705 (9th Cir. 1983). The United States Supreme Court held that a warrant affidavit should be corrected pursuant to Franks:

> [W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.

*Franks v. Delaware*, 438 U.S. 154, 155–56 (1978).

"[N]otwithstanding the defendant's interest in showing that a search warrant contained a false statement, 'there is, of course, a presumption of validity,'" attached to the warrant. *United States v. Napier*, 436 F.3d 1133, 1137 (9th Cir. 2006) (quoting *Franks v. Delaware*, 438 U.S. 154, 165, 171 (1978)). The defendant must demonstrate that the affiant intentionally or recklessly made a false statement or omission: mere negligence or inadvertence does not constitute a *Franks* violation. *United States v. Dozier*, 844 F.2d 701, 705 (9th Cir. 1988); *United States v. Collins*, 61 F.3d 1379, 1384 (9th Cir. 1995); see also *United States v. Hole*, 564 F.2d 298, 302 (9th Cir. 1977) (holding that innocent misstatements that are not intentional or reckless, even if material, will not vitiate an otherwise sufficient affidavit.)

A defendant must show that the affidavit could not support a finding of probable cause after purging its falsities and supplemented by the omissions. *United States v. Stanert*, 762 F.2d 775, 782 (9th Cir.), amended, 769 F.2d 1410 (9th Cir. 1985), (citing *Franks*, 438 U.S. at 171–72). A judge's probable cause determination is accorded "significant deference," *United States v. Gil*, 58 F.3d 1414, 1418 (9th

Cir.1995), and will be overturned only if it is "clearly erroneous." *United States v. Stanert*, 762 F.2d 775, 778 (9th Cir.1985). Suppression is an appropriate remedy if the judge issuing the search warrant was misled by information made in the affidavit that the affiant knew was false or would have known was false if not for his reckless disregard for the truth. *United States v. Leon*, 468 U.S. 897, 923 (1984).

Henderson has not made a substantial showing that Detective Ostrovsky's statements about Henderson in his search warrant declaration were false or that Detective Ostrovsky made misstatements deliberately or recklessly. While Detective Ostrovsky could have specifically noted that he did not see Henderson's face in the screenshots, he did specify how he identified Henderson (including his observations about Henderson's watch). I also find that Detective Ostrovsky credibly testified that he did not understand the difference between a live video and a story video on Facebook. I find that Detective Ostrovsky incorrectly stated that the videos were live. I find that Detective Ostrovsky made a good faith mistake and that he did not include the word "live" with reckless disregard for the truth.

Even if I struck Detective Ostrovsky's statements about his observations of the Henderson Facebook account, including but not limited to the phrase "live" and his phrase that he, "observed the video of Henderson holding a firearm" probable cause still exists based on the totality of the circumstances. Since I already found that there was sufficient probable cause to arrest Henderson, I also find that Detective Ostrovsky's inclusion of Henderson's post arrest admission that he shot a gun in response to being questioned about the Facebook posts is admissible. The search warrant is also still supported by probable cause because (1) the Henderson Facebook account appeared to belong to Henderson, (2) his date of birth matched, (3) investigators observed multiple videos of a man's hand wearing a distinct gold and silver watch handling and shooting a firearm that matched the watch Henderson wore in the screenshot that showed his face, and (4) the third-party statements made by the driver, Henderson's mother, Henderson's brother all corroborated that firearms were inside of the

residence that investigators saw Henderson exiting and entering. The detectives also determined that Henderson was a convicted felon prior to the arrest. Looking within the four corners of the declaration, these facts would reasonably allow a judge to believe that Henderson may have committed the crime of being a felon in possession of a firearm. These facts are all sufficient for probable cause under the totality of the circumstances. Since I find that Henderson's arrest was lawful and that the search warrant is valid, I find that all evidence that law enforcement recovered pursuant to the state search warrant, including the firearms, are admissible. I also find that the jail calls are not subject to suppression.

### B. Motion to compel

Under *Brady v. Maryland*, 373 U.S. 83 (1963), and *United States v. Agurs*, 427 U.S. 97 (1976), a defendant has the right to production of exculpatory evidence in the possession of the government. *United States v. Jennings*, 960 F.2d 1488, 1490 (9th Cir. 1992). Under *Henthorn*, when a defendant requests the personnel files of a testifying officer, the government must, "disclose information favorable to the defense that meets the appropriate standard of materiality…If the prosecution is uncertain about the materiality of information within its possession, it may submit the information to the trial court for an in camera inspection and evaluation…." *United States v. Henthorn*, 931 F.2d 29, 30-31 (9th Cir. 1991) (quoting *United States v. Cadet*, 727 F.2d 1453, 1467-68 (9th Cir. 1984)).

Judge Youchah's findings in the *Longmire* case does not implicate material evidence regarding Detective Ostrovsky's credibility. The defendant submits that he does not intend to recall Detective Ostrovsky to address the issues he raised regarding *Longmire.* The government is aware of its obligations under *Henthorn*. Since the government is not required to disclose the contents of personnel records unless they are material, I deny Henderson's motion to compel.

### C. Motion to strike a portion of defendant's supplemental reply

Since I find that Henderson's arrest was lawful, per the defendant's concession, any attack on the

federal search warrant is now moot. I deny the government's motion to strike as moot.

ACCORDINGLY,

I RECOMMEND that defendant Darryl Henderson's motion to suppress (ECF No. 30) be DENIED.

I ORDER that defendant Darryl Henderson's motion to compel (ECF No. 40) is DENIED.

I FURTHER ORDER that the government's motion to strike (ECF No. 50) is DENIED AS MOOT.

DATED this 29th day of September 2021.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE